**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| PAMELA HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-1952-JMS-MJD |
| | ) | |
| CARRIER CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S BRIEF IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Pamela Harris is a current Carrier employee who is out on medical leave. In early July 2015, Carrier granted Plaintiff a medical leave to accommodate a reported injury because her doctor would not return her to work. When Harris was finally released to return to work with restrictions, Carrier worked with her to find an open position within those restrictions. Ultimately, Harris told Carrier she could no longer perform even that job and as there were no other open positions within her restrictions, Carrier returned her to medical leave. While Carrier accommodated Harris, she filed this litigation.

From day one, Harris's claims have been a moving target. She asserts different claims, depending on the pleading or filing. Wading through these differences and inconsistencies reveals three operative claims, which are: (1) sex harassment under Title VII; (2) retaliation under Title VII, the ADA, and the ADEA for making an internal safety complaint; and (3) Carrier's alleged prohibited medical inquires under the ADA.

As to these claims, the undisputed evidence establishes that Carrier is entitled to summary judgment. First, Harris's sex harassment claim fails because most of the alleged conduct is not, on its face, related to Harris's sex and the remaining conduct is both time-barred

and outside the scope of Harris's prior administrative charges.  Even so, the alleged conduct, whether considered separately or collectively, is not objectively offensive so as to be actionable as a matter of law.

Harris's retaliation claims fare no better.  Her claims are based on an alleged internal "safety complaint," which is not "protected activity."  Regardless, there is no evidence that the two purported materially adverse actions she experienced (denial of overtime and a written reprimand for violating a work rule) were causally connected to her complaint.

Finally, Harris abandoned her medical inquiry claim by failing to include it in her Statement of Claims.  For all of these reasons, the Court should grant summary judgment to Carrier and dismiss what remains of Plaintiff's Amended Complaint.

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]**

Carrier, by its attorneys, and pursuant to Fed. R. Civ. P. 56 and Local Rule 56-1, submits the following statement of material facts as to which there is no genuine dispute.

## I.    CARRIER'S EMPLOYMENT POLICIES

1.    Carrier is a signatory to a Collective Bargaining Agreement ("CBA") with Local 1999 of the United Steelworkers Union (the "Union"), of which Harris has been a member throughout her employment.  [Dkt. 83-1 at 18-20 (Pl. Dep. 68:17-70:2).]

2.    Carrier also has an employee handbook (the "Handbook"), a copy of which Harris has received.  [Dkt. 83-1 at 61-62 (Pl. Dep. 124:14-18, 125:9-11); Dkt. 83-2 at 2-26 (Dep. Ex.

---

[1]    These facts are undisputed for the purposes of this motion only.  References to fact paragraphs contained in Carrier Statement of Material Facts Not In Dispute appear as "(SOF [fact paragraph])." References to deposition testimony and declarations appear as: "([deponent's last name] [page]:[line])" and "([declarant's last name] ¶[number])." With the exception of pleadings on the electronic docket, all of the evidentiary materials cited in support of Carrier's Statement of Material Facts, including deposition transcripts, deposition exhibits and declarations have been filed as exhibits to Carrier's Motion for Summary Judgment.

15); Dkt. 83-3 at 3 (Morris ¶ 6).] The Handbook contains Plant Rules that Carrier employees are expected to follow. [Dkt. 83-1 at 62 (Pl. Dep. 125:16-20); Dkt. 83-2 at 2-26 (Dep. Ex. 15); Dkt. 83-3 at 3 (Morris ¶ 6).]

3.      Plant Rule 15 prohibits the failure to meet quality, production, and/or housekeeping standards. [Dkt. 83-1 at 62-63 (Pl. Dep. 125:13-126:20); Dkt. 83-2 at 8 (Dep. Ex. 15).] Harris was aware of Plant Rule 15 and understood that the failure to meet Carrier's quality, production, and/or housekeeping standards could lead to a written warning, and, in the case of multiple offenses, a three-day disciplinary lay-off. [Dkt. 83-1 at 62-63 (Pl. Dep. 125:16-126:20); Dkt. 83-2 at 15 (Dep. Ex. 15).]

4.      Carrier has an Environmental Health & Safety Disciplinary Action Policy, which sets forth the disciplinary action associated with various safety compliance infractions. [Dkt. 83-1 at 120 (Pl. Dep. 225:6-21); Dkt. 83-4 at 2 (Dep. Ex. 21).] Under this policy, a violation of Carrier's lock out/tag out procedure results in a five-day suspension without pay, or possibly termination. [Dkt. 83-1 at 120-121 (Pl. Dep. 225:22-226: 6); Dkt. 83-4 at 2 (Dep. Ex. 21).]

5.      It is Carrier's policy that employees enjoy a workplace free from all forms of unlawful employment discrimination, harassment, and retaliation. [Dkt. 83-3 at 3 (Morris ¶ 5).] To that end, Carrier maintains equal opportunity, anti-discrimination, and non-retaliation policies. [Dkt. 83-1 at 66-67 (Pl. Dep. 130:25-131:9); Dkt. 83-5 at 2-17 (Dep. Ex. 16); Dkt. 83-3 at 3 (Morris ¶ 5).]

## II.    HARRIS'S EMPLOYMENT WITH CARRIER AS A JOURNEY WORKER

6.      Carrier hired Harris on February 15, 2005 as a Production Associate B, which is an entry level position. [Dkt. 83-1 at 23 (Pl. Dep. 73:14-22); Dkt. 83-3 at 3 (Morris ¶ 8).] At all times during her employment, Harris worked at Carrier's Indianapolis facility located at 7310

3

Morris Street.  [Dkt. 83-1 at 18 (Pl. Dep. 68:13-16).] Harris currently remains employed by Carrier.  [Dkt. 83-1 at 16 (Pl. Dep. 66:8-9).]

7.     In Spring 2007, Harris took and passed a test to join Carrier's Journey Worker Apprentice Program ("Apprentice Program"), which she saw as an opportunity for further advancement at Carrier.[2]  [Dkt. 83-1 at 26-27 (Pl. Dep. 76:2-77:7).]  Harris was then put on a waiting list to gain entry into the Program.  [Dkt. 83-1 at 26 (Pl. Dep. 76:6-10).]

8.     In March 2008, Harris learned she was selected for the Apprentice Program. [Dkt. 83-1 at 26 (Pl. Dep. 76:11-14).]  At that time, Harris became an Apprentice, and her pay increased to $17.46 per hour.  [Dkt. 83-1 at 26, 29 (Pl. Dep. 76:17-19, 79:6-13); Dkt. 83-6 at 2 (Dep. Ex. 9).]

9.     Carrier's Apprentice Program requires that Apprentices certify that they have completed the required number of educational and on-the-job training hours to be eligible to become a Journey Worker.  [Dkt. 83-1 at 27-28 (Pl. Dep. 77:13-78:7); Dkt. 83-3 at 3 (Morris ¶ 10).]  At the time Harris enrolled in the Apprentice Program, the minimum hours requirement was 7,000.  [Dkt. 83-1 at 97 (Pl. Dep. 199:7-9).]  Around August 2013, Harris made the required certification, at which point, Carrier then had to confirm the accuracy of Harris's records before representing to the U.S. Department of Labor that she had successfully completed the Apprentice Program.  [Dkt. 83-3 at 3 (Morris ¶ 10).]

10.    The on-the-job training necessary for the Apprentice Program consisted of learning the aspects of the assembly line, how to use certain tools, and understanding how the machinery worked, all of which Harris was able to learn. [Dkt. 83-1 at 27-28 (Pl. Dep. 77:13-78:11).]

---

[2]     A Journey Worker is also referred to as a Machine Repair person at Carrier.  [Dkt. 83-3 at 3 (Morris ¶ 9).]  For consistency, Carrier will use Journey Worker throughout its brief.

11.     Under Carrier's Standards of Apprenticeship Agreement, Apprentices are not permitted to work overtime unless all Journey Workers in the same classification, department, and shift are working and/or have been offered overtime work.  [Dkt. 83-1 at 59 (Pl. Dep. 122:6-16); Dkt. 83-3 at 3 (Morris ¶ 11).]

12.     The job duties of a Journey Worker include the modification, fabrication, and/or setup of machinery and equipment; adjustment and repair service for all types of machinery and equipment, metal parts, and tools; and troubleshooting and repair for malfunctioning machinery and equipment. [Dkt. 83-1 at 30 (Pl. Dep. 80:12-23); Dkt. 83-8 at 2 (Dep. Ex. 10).]

13.     Carrier's Physical Job Evaluation Form lists the job duties of a Journey Worker in order of importance and the amount of time devoted to each duty as: (1) troubleshooting and repair of mechanical equipment, (2) disassembling and rigging of mechanical equipment, and (3) various bench repair of mechanical items. [Dkt. 83-1 at 49-50 (Pl. Dep. 110:4-111:4); Dkt. 83-9 at 2 (Dep. Ex. 13).] The Physical Job Evaluation Form also indicates that a Journey Worker spends 10% of her time in an average eight-hour day performing lifting functions, where 80% of the time the lifting requirement is at least 10 pounds.  [Dkt. 83-1 at 53-55 (Pl. Dep. 114:22-116:15); Dkt. 83-9 at 2 (Dep. Ex. 13).]

14.     In January 2009, Carrier suspended its Apprentice Program due to the economic downturn.  [Dkt. 83-3 at 4 (Morris ¶ 12).]  As a result, all members were taken out of the Program.  [Dkt. 83-1 at 33 (Pl. Dep. 86:2-5); Dkt. 83-3 at 4 (Morris ¶ 12).] Because the Program had been temporarily disbanded, Harris returned to her former position as a Production Associate B.  [Dkt. 83-1 at 33 (Pl. Dep. 86:2-5).] On March 2, 2009, Harris was laid off as part of a reduction in force. [Dkt. 83-1 at 33 (Pl. Dep. 86:8-12); Dkt. 83-10 at 2 (Dep. Ex. 11).]

15.     In January 2010, Carrier rehired Harris into another position, as Carrier had not yet reinstated the Apprentice Program.   [Dkt. 83-1 at 37 (Pl. Dep. 91: 6-16); Dkt. 83-11 at 2 (Dep. Ex. 12); Dkt. 83-3 at 4 (Morris ¶ 12).] During her 10-month lay-off, Harris did not seek employment elsewhere because she was "waiting for recall to Carrier."  [Dkt. 83-1 at 36 (Pl. Dep. 90:3-10).] Harris was "glad" to return to work at Carrier in January 2010, and she has not looked for other employment since her rehire in January 2010. [Dkt. 83-1 at 37, 214-215 (Pl. Dep. 91: 3-5, 329:20-330:2).]  In July 2010, Carrier reinstated Harris to the Apprentice Program. [Dkt. 83-1 at 37 (Pl. Dep. 91:17-20).]

16.     In September 2013, Carrier's Apprentice Committee found Harris had fulfilled the requirements of the Apprentice Program, and therefore, promoted Harris from Apprentice to Journey Worker. [Dkt. 83-1 at 38 (Pl. Dep. 92:8-11); Dkt. 83-6 at 2 (Dep. Ex. 9); Dkt. 83-7 at 3 (Martin ¶ 7).]  Harris received a pay increase from $22.53 to $23.11, and she moved from first to second shift. [Dkt. 83-1 at 38, 66 (Pl. Dep. 92:17-19, 130:16-21); Dkt. 83-6 at 2 (Dep. Ex. 9).] The Department of Labor issued Harris's Certificate of Completion of Apprenticeship in September 2016.  [Dkt. 83-1 at 107 (Pl. Dep. 212:3-14); Dkt. 83-12 at 2 (Dep. Ex. 17).]

17.     Harris worked continuously as a Journey Worker from September 2013 until around late June 2015, when she claims she injured her shoulder while working. [Dkt. 83-1 at 41 (Pl. Dep. 101:16-21).]

## III.   HARRIS'S INJURY AND LEAVES OF ABSENCE

18.     Harris claims she was injured on June 27 or 28, 2015 while replacing chains on a press conveyor. [Dkt. 83-1 at 168 (Pl. Dep. 283:13-16).]  Since this alleged injury, Harris reports being "very limited" in using her left arm and hand.  [Dkt. 83-1 at 168 (Pl. Dep. 283:9-12).] Harris is left-handed.  [Dkt. 83-1 at 56 (Pl. Dep. 117:8-9).]

39154335v.1

19. On the evening of June 30, 2015, Harris went by ambulance from Carrier to the hospital after reporting pain in her left shoulder and neck. [Dkt. 83-1 at 168 (Pl. Dep. 283:17-23).] Following her hospital visit, Harris did not return to work until July 7, 2015. [Dkt. 83-1 at 168-169 (Pl. Dep. 283:17-284:8); Dkt. 83-3 at 4 (Morris ¶ 13).] From then until July 21, 2015, for the most part, she performed miscellaneous work on the shop floor, including cleaning out and sorting cabinets. [Dkt. 83-1 at 44-45 (Pl. Dep. 105:10-106:13).]

20. Harris next saw a physician on July 21, 2015, when she met with Carrier to discuss her fitness for duty. [Dkt. 83-1 at 170 (Pl. Dep. 285:15-21).] Carrier's doctor told Harris that she could not return to work as a Journey Worker until her physician assessed her ability to perform her job functions. [Dkt. 83-1 at 171 (Pl. Dep. 286:9-14).]

21. On July 29, 2015, Harris met with her physician. [Dkt. 83-1 at 171-172 (Pl. Dep. 286:24- 287:2).] During this visit, Harris reported that she had injured her left shoulder at work and that her job required her to repair heavy machinery. [Dkt. 83-1 at 172 (Pl. Dep. 287:10-15); Dkt. 83-13 at 2 (Dep. Ex. 25).] She also reported that it was hard to bear any weight with her left arm. [Dkt. 83-1 at 172-173 (Pl. Dep. 287:24-288:5); Dkt. 83-13 at 2 (Dep. Ex. 25).] Harris's doctor concluded during this visit that he could not release her to work. [Dkt. 83-1 at 172-73 (Pl. Dep. 287:3-9, 288:7-10); Dkt. 83-13 at 3 (Dep. Ex. 25).]

22. As a result of her June 2015 injury, Carrier granted Harris a medical leave of absence beginning in July 2015. [Dkt. 83-1 at 206 (Pl. Dep. 321:22-25).] Harris retained her medical insurance benefits and received short-term disability income benefits while on leave. [Dkt. 83-1 at 207 (Pl. Dep. 322:2-4, 20-22).]

23. In connection with her July 29, 2015 application for short term disability benefits, her physician certified that Plaintiff was "continuously and totally disabled" from June 28, 2015

to the "present," and that she could not return to work until September 1, 2015, at the earliest. [Dkt. 83-1 at 173-174 (Pl. Dep. 288:21-289:21); Dkt. 83-14 at 3 (Dep. Ex. 26).]

24.     Following her June 2015 injury, Harris filed a workers' compensation claim, which Carrier's workers' compensation insurer (AIG) denied, finding the injury not to be work-related. [Dkt. 83-1 at 174-75 (Pl. Dep. 289:23-290:12); Dkt. 83-15 at 2 (Dep. Ex. 27); Dkt. 83-3 at 4 (Morris ¶ 15).]  AIG, not Carrier, adjudicated Harris's claim.  [Dkt. 83-3 at 4 (Morris ¶ 14).]

25.     On September 11, 2015, Harris's doctor cleared her to return to work with these restrictions: limited use of her left arm, no repetitive use of left arm, no overhead lifting, no lifting over 5 pounds, or pulling over 20 pounds with her left arm.  [Dkt. 83-1 at 176-77 (Pl. Dep. 291:9-292:2); Dkt. 83-16 at 2 (Dep. Ex. 29).]  As of February 22, 2016, these were made permanent.  [Dkt. 83-1 at 184-85 (Pl. Dep. 299:24-300:5).]

26.     Given her doctor's September 11, 2015 medical restrictions, Harris could perform only one of the primary job duties of her Journey Worker position, which was bench repair work. [Dkt. 83-1 at 179-80 (Pl. Dep. 294:3-295:11).]

27.     On September 11, 2015, Harris requested that Carrier return her to work in this role.  [Dkt. 83-1 at 177 (Pl. Dep. 292:3-9); Dkt. 83-3 at 4 (Morris ¶ 16).]  Carrier's Joint Restrictions Committee met to discuss whether it was possible to return Harris to work as a Journey Worker with her medical restrictions, and all agreed (including Harris' union representative) that it was not possible to accommodate her restrictions in her Journey Worker role.  [Dkt. 83-3 at 4 (Morris ¶ 17)].

28.     On September 21, 2015, Carrier informed Harris in writing that it was unable to return her to work as a Journey Worker and asked her to inform it of any changes in her

condition, which might impact Carrier's ability to return her to work.  [Dkt. 83-1 at 178-79 (Pl. Dep. 293:17-294:2); Dkt. 83-17 at 2 (Dep. Ex. 30).]

29.     On March 9, 2016, Harris sent a letter to Carrier asking that Carrier consider reassigning her to a different position.  [Dkt. 83-1 at 190-91 (Pl. Dep. 305:19-306:7); Dkt. 83-18 at 2 (Dep. Ex. 31).]  In response, Carrier began working with Harris and her physician to determine if reassignment to an open position within her restrictions was possible.  [Dkt. 83-1 at 191-203 (Pl. Dep 306:8-318:16); Dkt. 83-3 at 5 (Morris ¶ 18).]

30.     In March 2016, Carrier identified three open positions and presented each to Harris.  [Dkt. 83-1 at 191 (Pl. Dep. 306:8-25); Dkt. 83-19 at 2 (Dep. Ex. 32); Dkt. 83-3 at 5 (Morris ¶ 19).]  Between March and late June 2016, Carrier met with Harris in person and spoke to her by phone several times to explore whether she could return to work in any one of these three roles.  [Dkt. 83-1 at 191, 193, 197, 201 (Pl. Dep. 306:8-16, 308:8-23, 312:10-13, 316:7-10).]  During some of those discussions, Harris expressed concerns about "ergonomics" and the possibility that she might injure her left arm if she were to perform any of the three jobs that Carrier had identified.  [Dkt. 83-1 at 192-193, 193-194, 197 (Pl. Dep. 307:23-308:3, 308:24-309:10, 312:14-17).]  Following these discussions and after further evaluation, Carrier and Harris ultimately agreed to not reassign her to any of these roles due to concerns about whether she could safely perform the essential job functions within her restrictions.  [Dkt. 83-1 at 202-203 (Pl. Dep. 317:18-318:4); Dkt. 83-3 at 5 (Morris ¶ 20).]  Carrier continued exploring other options.  [Dkt. 83-3 at 5 (Morris ¶ 20).]

31.     In mid-August 2016, Carrier met with Harris in person to discuss her interest in a fourth position - an open Precision Inspector position.  [Dkt. 83-1 at 203 (Pl. Dep. 318:5-16).]  Based on Harris's and her union's input, Carrier reassigned Harris to the Precision Inspector

position from August 24, 2016 to September 22, 2016. [Dkt. 83-1 at 203-204 (Pl. Dep. 318:5-319:2); Dkt. 83-3 at 5 (Morris ¶ 22)] A Precision Inspector's primary job duties are to inspect and test various components, including parts and assemblies. [Dkt. 83-1 at 47-48 (Pl. Dep. 108:20-109:5).] This position does not require heavy or repetitive lifting or pulling. [Dkt. 83-3 at 5 (Morris ¶ 21).] Carrier believed that the Precision Inspector position was within her restrictions, and Harris's union supported the reassignment. [Dkt. 83-3 at 5 (Morris ¶ 21).] However, on September 22, 2016, Harris went back on medical leave, stating that the Precision Inspector job was "very stressful on [her] left hand." [Dkt. 83-1 at 203-204, 206 (Pl. Dep. at 318:24-319:6, 321:18-21).] Harris currently remains on leave. [Dkt. 83-1 at 48, 206 (Pl. Dep. 109:19-20, 321:18-21).]

32.     In November or December 2016, Harris applied for social security disability benefits certifying that she was unable to work and listed the date of her disability as sometime in mid-July 2015. [Dkt. 83-1 at 11-13 (Pl. Dep. at 58:3-60:5).]

## IV.   HARRIS'S CLAIMS

### A.   Sex Harassment

33.     Harris claims that she was harassed because of her sex. [Dkt. 83-1 at 70-73 (Pl. Dep. 135:2-138:9); Dkt. No. 49 at ¶¶ 12, 14, 22).] Harris offers the following to support her claim:

(a) Sometime before 2013, Supervisor Rod Martin was "screaming" and telling Harris that he hadn't authorized her to help dismantle a press. Harris testified she has "no clue what Rod Martin's issues were," that Martin screamed at male employees at times, and she "couldn't say for sure" that this incident was related to her sex. [Dkt. 83-1 at 76-77, 78, 80 (Pl. Dep. 149:23-150:17, 151:9-21, 153:7-18.).]

39154335v.1

(b) Harris received two written warnings in January and July 2013 for Plant Rule 15 violations. [Dkt. 83-1 at 109-110 (Pl. Dep. 214:22-215:5).] Harris believes that Martin issued the January 2013 write-up because earlier that same day she had contacted Carrier's EH&S Department about a work order Martin had given her that she felt put her in "an unsafe position" and that Martin was upset and "hot" about it. [Dkt. 83-1 at 112-114, 115 (Pl. Dep. 217:18-219:23, 220:9-19).] Harris testified that Rod Martin issued the January 2013 reprimand after instructing her not to touch any wires as part of a work project and Harris did so anyway and that she didn't "have a clue why" Supervisor Bryan Austin issued the July 2013 reprimand. [Dkt. 83-1 at 110-111, 117-118, 119 (Pl. Dep. 215:21-216:22, 222:23-223:9, 224:16-24).] Harris testified that Carrier subsequently removed the January and July 2013 write-ups from her personnel file. [Dkt. 83-1 at 115-117, 121, 122 (Pl. Dep. 220:21-222:17, 226:10-20, 227:17-21).] From 2013-2015, 7 male Journey Workers received three-day suspensions without pay for Plant Rule 15 violations. [Dkt. 83-1 at 123 (Pl. Dep. 228:9-19); Dkt. 83-3 at 3 (Morris ¶ 7).]

(c) Her Certificate of Completion of Apprenticeship from the Department of Labor was delayed. [Dkt. 83-1 at 96 (Pl. Dep. 196:9-12).] Harris testified that this delay was caused by Carrier's "negligence" and due to an "oversight." [Dkt. 83-1 at 100-101, 104 (Pl. Dep. 204:13-205:4, 209:4-9).)

(d) Martin denied her opportunities to work overtime in 2012-2013 when she was an Apprentice. [Dkt. 83-1 at 124, 126, 128-129 (Pl. Dep. 229:8-24, 231:21-24, 233:10-234:11).] Harris testified that during that time frame Apprentices were not needed to work overtime and that no Apprentices worked on those dates, only Journey Workers did. [Dkt. 83-1 at 129-131, 132-133 (Pl. Dep. 234:25-236:2, 237:9-238:17).] Harris testified that Martin had told her she was not eligible for overtime because she was an Apprentice, and that there were occasions in

2012 and 2013 when she was offered and turned down overtime work while working as an Apprentice. [Dkt. 83-1 at 124-125, 129 (Pl. Dep. 229:25-230:14, 234:12-15).]

(e)     She was given "inappropriate" work orders and assigned to work alone in "hazardous conditions" on two occasions. [Dkt. 83-1 at 133-135 (Pl. Dep. 238:18-240:7).] Harris believes these work orders were related to her sex "[b]ecause when [she] had a complaint about it, [her] supervisor did not want to hear a reason. He just said 'do it.'" [Dkt. 83-1 at 139 (Pl. Dep. 246:9-15).] The first was an assignment to work in an "isolated" area of the plant with "unknown dangers"; however, she did not complete the assignment and Rod Martin reassigned the work to male employees. [Dkt. 83-1 at 133-135, 136 (Pl. Dep. 238:23-240:7, 241:5-16).] The second was a demolition project that Harris believed was a "two-man job," during which she was struck in the chest by a steel piece; however this project was not reassigned to two people. [Dkt. 83-1 at 135-136 (Pl. Dep. 240:22-241:23); Dkt. 83-7 at 3 (Martin ¶ 6).]

(f)     Harris was not allowed to order certain tools. [Dkt. 83-1 at 86, 88 (Pl. Dep. 179:2-7, 181:15-20).] Harris testified that Martin did allow her to order some of the tools that she requested, and that she did not know whether requests of male employees for particular tools were granted or denied. [Dkt. 83-1 at 89, 91 (Pl. Dep. 182:19-21, 184:6-10).]

(g)     Harries believes she was denied "well-rounded" training opportunities. [Dkt. 83-1 at 140, 143 (Pl. Dep. 247:8-11, 250:3-5).] In 2011, Martin transferred Harris to his same shift so that he could help train her. [Dkt. 83-7 at 2 (Martin ¶ 5).] Harris testified that at least nine of her male co-workers assisted her with her work while she was an Apprentice. [Dkt. 83-1 at 146-149 (Pl. Dep. 253:14-256:10).]

(h)     Sometime before Fall 2013, co-worker Rick (last name unknown) told her to "get out of the way" and stood in her way so she couldn't see how to repair something.  [Dkt. 83-1 at 82-83 (Pl. Dep. 155:7-18, 156:3-23).]

(i)     Co-worker Orville Gann said to her in 2008 or early 2009 that "women should not be working in the skilled trades position."  Harris testified that Gann does not have any authority to hire, fire, promote, or transfer employees.  [Dkt. 83-1 at 152-153 (Pl. Dep. 259:11-24, 260:8-11); Dkt. 83-3 at 6 (Morris ¶ 24).]

(j)     Supervisor Frank Greenlee (to whom she did not report) criticized her for "doing a man's job" in September 2010.  [Dkt. 83-1 at 156 (Pl. Dep. 264:8-22).]

(k)     Sometime in 2014, Supervisor Alex "Gregg" Thorpe referred to her as his "girlfriend" 4 or 5 times, said "we need to meet, let's have a date," and sometimes snuck up behind her which made her jump. [Dkt. 83-1 at 159-160, 161, 163 (Pl. Dep. 274:15-275:24, 276:7-9, 278:11-23).] Harris testified that she didn't know why Thorpe made these comments. [Dkt. 83-1 at 161(Pl. Dep. 276:10-13).]

**B.     Retaliation**

34.     Harris testified that she bases her retaliation claim on the January 2013 write-up she received from Martin after contacting Carrier's EH&S Department about a "safety violation," Martin's denial of her requests to work overtime. [Dkt. 83-1 at 166 (Pl. Dep. 281:13-25).]  In her Statement of Claims, Harris bases her retaliation claim on the denial of her worker's compensation claim and for being denied a "reasonable accommodation for her disabilities." [Dkt. 73 at 4.]

**C.     ADA Claims**

35.     Harris's Amended Complaint sets forth her ADA claims as: (1) failure to accommodate her shoulder injury, and (2) disparate treatment on the basis of her disability

and/or a regarded-as disability when Carrier issued her "unwarranted discipline" and subjected her to less favorable terms and conditions of employment . [Dkt. 49 ¶¶ 20, 37, 38.] The Court has already held that Harris's ADA claim is based on Carrier conducting prohibited medical inquiries into her medical condition. [Dkt. 74 at 5-6.] Harris testified that she believed her ADA claim is a failure to accommodate claim. [Dkt. 83-1 at 167-168 (Pl. Dep. 282:15-283:4).] In her Statement of Claims, Harris identifies her ADA claims as ones for failure to accommodate and disability discrimination. [Dkt. 73 at 3-4.] Harris states that she believes that Carrier failed to accommodate her shoulder injury by not allowing her to return to work as a Journey Worker between September 2015 until August 2016 instead of reassigning her to the Precision Inspector position, and by not reassigning her to a "safety" position. [Dkt. 83-1 at 168, 177, 184, 185-186, 188, 208-209, 210-211 (Pl. Dep. 283:5-8, 292:3-9, 299:2-6, 300:25-301:21, 303:16-22, 323:2-324:17, 325:25-326:4).] Harris testified that in September 2015 she told the EEOC that she wasn't sure if she could return to work with or without accommodation at that time and that she would not be able to perform most of the position's job duties. [Dkt. 83-1 at 182-183 (Pl. Dep. 297:4-298:14).]

36.     The "safety" position to which Harris is referring is an Ergonomics Technician position which Carrier eliminated in 2008 after no employee had held the position since March 2008. [Dkt. 83-3 at 5 (Morris ¶ 23).]

## V.     HARRIS'S EEOC CHARGES OF DISCRIMINATION

37.     On July 24, 2013, Harris filed her first Charge of Discrimination against Carrier, Charge No. 470-2013-02840. [Dkt. 83-1 at 4 (Pl. Dep. 34:6-14); Dkt. 83-20 at 2-3 (Dep. Ex. 6).] On or about September 14, 2015, the EEOC issued a Dismissal and Notice Of Rights for the first Charge. [Dkt. 83-1 at 5-8 (Pl. Dep. 35:17-36:7, 37:23-38:2); Dkt. 83-21 at 3 (Dep. Ex. 7).]

39154335v.1

38.     On December 3, 2015, Harris filed a second Charge of Discrimination against Carrier, Charge No. 470-2015-02730.  [Dkt. 83-1 at 4 (Pl. Dep. 34:6-14); Dkt. 83-20 at 4-5 (Dep. Ex. 6).]  On or about August 16, 2016, the EEOC terminated its processing of the second Charge and issued a Notice Of Right To Sue.  [Dkt. 83-1 at 5-8 (Pl. Dep. 35:17-36:7, 37:23-38:2); Dkt. 83-21 at 2 (Dep. Ex. 7).]

## VI.     PROCEDURAL BACKGROUND

39.     On December 11, 2015, Harris filed a *pro se* complaint, asserting claims under Title VII of the Civil Rights Act of 1964 ("Title VII") (race and sex), the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), the Equal Pay Act ("EPA"), and the Genetic Information Nondiscrimination Act ("GINA").  (Dkt. No. 1.)  Carrier answered the initial complaint.  (Dkt. No. 9.)  After retaining counsel, Harris filed an Amended Complaint on October 6, 2016 to incorporate claims asserted in her December 2015 Charge. (Dkt. No. 49.)  The Amended Complaint maintains Harris's prior claims with the exception of her EPA and GINA claims, and clarifies that the retaliation claim is brought under Title VII, the ADA, and the ADEA,  (Dkt. No. 49.)

40.     On October 28, 2016, Carrier moved to dismiss Harris's race, age and disability discrimination and retaliation claims.  (Dkt. No. 53.)  On March 23, 2017, this Court ruled on Carrier's motion (the "March 23, 2017 Order") denying the motion in part as moot because Harris had abandoned her race- and age-based claims.  (Dkt. No. 74.)  As to Harris's ADA claim, the Court relied on Harris's representations that her only ADA claim was one for an "improper medical inquiry" and therefore denied Carrier's motion finding that claim sufficiently pled. (Dkt. No. 74.)

41.     On March 31, 2017, the Court stayed this case in its entirety pending further order of the Court.  (Dkt. No. 75.)  On May 9, 2017, the Court lifted the stay.  (Dkt. No. 77.)  On May

10, 2017, the Court ordered Carrier to answer Plaintiff's Amended Complaint and to file its

motion for summary judgment by May 24, 2017.  (Dkt. No. 79.)  On May 16, 2017, Carrier

answered Plaintiff's Amended Complaint.  (Dkt. No. 80.)

## ARGUMENT

### I.  SUMMARY JUDGMENT STANDARD.

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once a movant meets its burden, the

non-movant must provide specific facts demonstrating a genuine issue for trial.  FED. R. CIV. P.

56(c); *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008).  "The plaintiff cannot

merely allege the existence of a factual dispute to defeat summary judgment. …  Instead, [she]

must supply evidence sufficient to allow a jury to render a verdict in [her] favor."  *Basith v. Cook

County*, 241 F.3d 919, 926 (7th Cir. 2001) (internal quotation marks and citations omitted).

### II.  HARRIS'S SEX HARASSMENT CLAIM FAILS AS A MATTER OF LAW.

To withstand summary judgment, Harris must show: "(1) the work environment was both

subjectively and objectively offensive; (2) that the harassment was based on membership in a

protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for

employer liability."  *Chaney v. Plainfield Healthcare Ctr.,* 612 F.3d 908, 912 (7th Cir. 2010)

(citing *Mendenhall v. Mueller Streamline Co.,* 419 F.3d 686, 691 (7th Cir. 2005)).  Harris cannot

meet this burden.

Harris relies on the following alleged conduct which allegedly took place over a period of

more than nine years:

(1)     Supervisor Rod Martin "screaming" and telling Harris that he hadn't authorized
         her to help dismantle a press;

(2)     Receiving write-ups in January and July 2013 for Plant Rule 15 violations, which were later withdrawn;

(3)     A delay in receiving her Certificate of Completion of Apprenticeship from the Department of Labor;

(4)     Martin denying her opportunities to work overtime in the 2012-2013 time period;

(5)     Receiving "inappropriate" work orders and assigned to work alone in "hazardous conditions";

(6)     Not being allowed to order certain tools;

(7)     Being denied "well-rounded training opportunities"

(8)     Co-worker "Rick" (last name unknown) told her to "get out of the way" and stood in her way so she couldn't see how to repair something;

(9)     In late 2008 or early 2009, Group Leader Orville Gann saying that "women should not be working in the skilled trades position";

(10)    In September 2010, Supervisor Frank Greenlee criticizing her for "doing a man's job"; and

(11)    Sometime in 2014, Supervisor Alex "Gregg" Thorpe referring to her as his "girlfriend" 4 or 5 times, saying "we need to meet, let's have a date," and sometimes sneaking up behind her which made her jump.

(SOF 33.)

Summary judgment should be granted on Harris's hostile work environment claim because: (a) most of the above conduct was not motivated by her sex, is not objectively offensive, or is otherwise barred; and (b) even if all of the conduct is considered, it was not severe or pervasive enough to constitute a hostile work environment.

### A.     Harris Abandoned Several Of Her Allegations Of Harassment.

Harris's claim that she was denied overtime opportunities, her journey worker certificate was delayed, and Rick's alleged comment to "get out of the way" – allegations (6), (7) and (8) above – were not included in her Statement of Claims, and as such she has abandoned them. *Tucker v. Express Scripts Holding*, Case No. 14-cv-01698, 2016 WL 2643737, at *8-9 (S.D. Ind.

May 10, 2016) (granting summary judgment in favor of defendant on plaintiff's harassment claim, in part, because plaintiff abandoned the claim in his Statement of Claims); *see also Deputy v. City of Seymour*, Case No. 13-cv-412, 2014 WL 4907911, at *5 (S.D. Ind. Sept. 30, 2014) "[r]equiring the plaintiff to assess the validity of its claims and list what it intends to pursue after non-expert discovery closes protects both parties … [including that] it ensures that a defendant is aware of all outstanding claims when it moves for summary judgment…"). Even so, whether taken separately or together they cannot save Harris's claim.

**B.      The Majority Of Harris's Remaining Allegations Are Unrelated to Her Sex and Are Not Objectively Offensive.**

Title VII "does not prohibit all verbal or physical harassment in the workplace." *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 463 (7th Cir. 2002); *Vore v. Indiana Bell Tel. Co.,* 32 F.3d 1161, 1162 (7th Cir. 1994) (Title VII "does not guarantee a utopian workplace, or even a pleasant one."). To be actionable under Title VII, a plaintiff must show that (i) the harassment was based on her membership in a protected class, *Heuer v. Weil-McLain*, 293 F.3d 1021, 1024 (7th Cir. 2000), and (ii) it was "both subjectively and objectively offensive" – i.e., conduct that "a reasonable person would find hostile or abusive, and … that the victim in fact did perceive to be so." *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). Most of Harris's allegations fail to satisfy these elements.

Much of the alleged conduct does not, on its face, have anything to do with Harris's sex. Harris alleges that on one occasion, Martin came over to her "screaming," telling her that he hadn't authorized her to help an employee dismantle a press. (SOF 33(a).) Harris testified she had "no clue" what prompted this outburst, that Martin screamed at male employees at times, and that she "couldn't say for sure" that this incident related to her sex at all. (SOF 33(a).)

18

As for the two write-ups that she received in January and July 2013 (both of which were later withdrawn), there is no evidence that either were related to her sex. Harris admits that Martin issued the January 2013 reprimand because he had instructed her not to touch any wires as part of a work project, then Harris did so anyway. (SOF 33(b).) Moreover, Harris also testified that she believes her report to the EH&S department about a work order Martin gave her is what motivated the January 2013 reprimand, not her sex. (SOF 33(b).) As to the July 2013 reprimand, Harris testified that she didn't "have a clue why [Austin] wrote [her] up" (SOF 33(b).) Thus, her belief that the reprimand is somehow related to her sex is pure conjecture, which is insufficient to defeat summary judgment. *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

Regardless, in receiving these reprimands Harris was actually <u>treated better</u> than her male counterparts. It is undisputed that Harris was not suspended for these two Plant Rule 15 violations, whereas from 2013-2015 Carrier issued three-day suspensions to seven male employees for violating Plant Rule 15. (SOF 33(b).)

Harris's other allegations are entirely contradicted by her own sworn deposition testimony. Harris claims that after Carrier approved her to become a Journey Worker, Carrier delayed the issuance of her Certificate of Completion of Apprenticeship from the Department of Labor. However, it is undisputed that immediately after the approval, Carrier began paying her Journey Worker wages, and Harris admits that any delay in receiving her Certificate of Completion was due to Carrier's "negligence" and "oversight," not hostility to her sex. (SOF 33(c).)

While Harris alleges that Martin denied her overtime opportunities in 2012-2013 when she was an Apprentice, it is undisputed that by company rule, <u>no Apprentices</u> (male or female)

worked overtime during that time, only Journey Workers.  (SOF 11, 33(d).)  As such, overtime was denied based on the Apprentice/Journey Worker distinction, not Harris's sex.

Harris's generalized allegations about Martin similarly fail, as nothing about these allegations tie the alleged conduct to Harris's sex[3]:

- Harris claims that Martin did not allow her to order certain tools,[4] but she concedes that she does not know whether Martin also denied or granted similar requests made by male employees. (SOF 33(f).)

- Harris claims that Martin denied her "well-rounded training opportunities," but admits that not only was she trained (SOF 10, 33(g)), but Martin transferred her to his shift specifically so that he could provide her training and that at least nine of her male co-workers pitched in to help train her.  (SOF 10, 33(g).)

- Harris claims that on two occasions Martin gave her "inappropriate" work orders and assigned her to work in "hazardous conditions." However, the first was an assignment that Harris never completed and was reassigned to male employees. (SOF 33(e).)  The second was an assignment that Harris simply believed should have been a "two-man job," but, after she failed to complete the work, it was *not* reassigned to two employees.  (SOF 33(e).)

Equally insufficient is Harris's claim that sometime before 2013, a co-worker named "Rick" told her to "get out of the way" and stood in her way so that she couldn't see how to repair something.  (SOF 33(h).)  Even if Harris had not abandoned this claim, as with the other allegations, nothing about this allegation suggests that it was motivated by Harris's sex.

In sum, none of the above alleged conduct is related to Harris's sex, nor is it alone or together objectively offensive.  Instead, it amounts to nothing more than "normal workplace friction" which objectively is "neither severe nor pervasive enough to constitute harassment

---

[3]     The fact that Martin was among the Apprentice Committee members who found that Harris had fulfilled the requirements of the Apprentice Program and promoted her from Apprentice to Journey Worker in September 2013 further negates any inference that Harris's sex negatively motivated Martin toward her.  (SOF 16.)

[4]     Her Statement of Claims erroneously imputes this to Brad Hepner.  (Dkt. 73, at 3.)

interfering with [Plaintiff's] work performance." *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004).

### C. The Only Possibly Sex-Related Comments Are Barred.

This leaves Harris with only three allegations, all of which are claimed by her to have taken place over approximately a six year time frame, that **may** relate to her sex: (1) Gann's 2008 or 2009 statement that "women should not be working in skilled trades positions"; (2) Greenlee's 2010 statement that she was "doing a man's job"; and (3) Thorpe's 2014 comments about Harris being his "girlfriend." (SOF 33(i) - (k).) However, the Court cannot consider these allegations because they are barred, either because they are outside the scope of her EEOC charges or because they occurred more than 300 days before Harris's most recent Charge.

### 1. *Gann's And Greenlee's Alleged Comments Are Outside The Scope Of Harris's EEOC Charges.*

A Title VII plaintiff generally "cannot bring claims in a lawsuit that were not included in her EEOC charge." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (citing *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47 (1974)). Harris filed her first EEOC Charge on July 24, 2013. This Charge makes no mention of alleged harassment by Gann, Greenlee, Thorpe, or anyone else for that matter. (SOF 37.) As to Harris's second EEOC Charge dated December 3, 2015, while she does allege harassment in that Charge, she refers only to Thorpe's alleged conduct. (SOF 38.) As such, Gann's and Greenlee's comments are barred because they are outside the scope of her Charges. *Cheek*, 31 F.3d at 501. ("[T]he EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals*.").

*All Three Alleged Comments Occurred More Than 300 Days Before Harris's Most Recent EEOC Charge And Are Therefore Time Barred.*

While Harris did include Thorpe's alleged conduct in her second EEOC Charge, that conduct is time barred. To bring a Title VII claim, a plaintiff must file an EEOC charge within 300 days of the conduct giving rise to the claim. 42 U.S.C. § 2000e–5(e)(1); *Moore v. Vital Prods., Inc.,* 641 F.3d 253, 256 (7th Cir. 2011) ("Any complaint of conduct that occurred more than 300 days before the relevant EEOC charge is time-barred."). As to Thorpe's alleged conduct, Harris concedes that occurred in 2014. (SOF 33(k), 38.) Even assuming the alleged conduct occurred on the last day of the year (December 31, 2014), it is more than 300 days before Harris filed her second Charge on December 3, 2015. As such, Harris's claim based on Thorpe's alleged conduct is also barred. *Heuer v. Weil-McLain*, 203 F.3d 1021 (7th Cir. 2000) ("When the only conduct so motivated [by a protected class] occurs more than the maximum permitted time before the charge is filed, the suit is barred.").

3. *Even If Gann's, Greenlee's, and Thorpe's Comments Were Not Barred, They Are Insufficient As A Matter Of Law To Support Harris's Claim.*

Even if the Court could consider the alleged comments made by Gann, Greenlee, and Thorpe, they amount to three non-actionable comments made over the course of more than approximately six years. Such isolated and sporadic conduct is insufficient as a matter of law to support an harassment claim. *Whittaker v. Northern Illinois Univ.,* 424 F.3d 640, 646 (7th Cir. 2005) ("It is well settled that 'relatively isolated instances of non-severe misconduct will not support a claim of hostile work environment.'") (citation omitted); *Hart v. Forge Indus. Staffing Inc.,* 2014 WL 1316585 (S.D. Ind. Mar. 28, 2014) ("[T]he Seventh Circuit has time and again held that isolated remarks, even when unambiguously offensive in nature, are insufficient to create a hostile work environment.") (citing *Ellis v. CCS of Tenn. LLC,* 650 F.3d 640, 648-49 (7th Cir. 1011) (collecting cases)).

**D. Harris's Allegations Whether Considered Separately Or Together Do Not Constitute An Actionable Hostile Working Environment.**

Even if the Court were to consider all of Harris's allegations together, they would not constitute conduct that is so severe or pervasive as to be a "hellish" work environment. As this Court recognized in *Hart,* the Seventh Circuit has refused to find far more egregious and pervasive conduct to present a triable hostile work environment claim. *See* 2014 WL 1316585, at *7 (noting allegations in *Baskerville* included alleged harasser making comments such as "pretty girl," "[a]ll pretty girls run around naked," and "better think of [her] as Ms. Anita Hill," as well as gesturing with his hand to indicate masturbation and grunting at plaintiff in sexual manner were insufficient) (citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d, 428, 430–31 (7th Cir. 1995)).

Here, at most, Harris alleges that (i) Thorpe called her "girlfriend" 3 or 4 times, said "we need to meet, let's have a date," and sometimes snuck up behind her which made her jump; (ii) Gann, Greenlee, and "Rick" years ago respectively said on a single occasion each that "women should not be working in skilled trades positions," Harris was "doing a man's job," and "get out of the way"; and (iii) various seemingly-innocuous workplace decisions and incidents which on their face were not tied to Harris's sex and for which there is no evidence such a tie existed. (SOF 33.) As in *Hart,* "[t]hese incidents do not come close to the level of severity in *Baskerville* or in numerous other cases in which the Seventh Circuit Court of Appeals held that the offending conduct there did not even rise to the level of actionable harassment under Title VII." 2014 WL 1316585, at *8 (*citing Weiss v. Coca-Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir. 1993) ( "alleged harasser asked plaintiff for dates, called her a 'dumb blonde,' put his hand on her shoulder several times, attempted to kiss her on multiple occasions, and placed 'I love you' signs in her work area") and *McPherson v. City of Waukegan,* 379 F.3d 430, 439 (7th Cir. 2004)

("alleged harasser touched the plaintiff's breasts on multiple occasions, asked her what color bra she was wearing, and asked if he could 'make a house call' when she called in sick")).

For any and all of these reasons set forth *supra*, the Court should grant summary judgment to Carrier on Harris's sex harassment claim.

## III. HARRIS'S RETALIATION CLAIM FAILS AS A MATTER OF LAW.

To sustain her claim for retaliation under Title VII, Harris must show that she "(1) engaged in statutorily protected activity; (2) she suffered an adverse employment action taken by the employer; and (3) there was a causal connection between the two." *Northington v. H & M Int'l,* 712 F.3d 1062. 1065 (7th Cir. 2013). Harris cannot meet the first and third elements.[5]

### A. Harris Did Not Engage In Protected Activity.

"Statutorily protected activity" consists of opposition to any discriminatory employment practice made unlawful under Title VII. 42 U.S.C. § 2000e–3(a). That is not Harris's claim. It is undisputed that her claim is that she was retaliated against for reporting alleged safety violations to Carrier. (SOF 34.) That is not protected activity as a matter of law. *Ellis v. CCA of Tenn., LLC*, 2010 WL 2605870, at *10 (S.D. Ind. June 21, 2010) (Title VII does not "provide[] a cause of action for retaliation in response to a plaintiff's report of or complaint about safety concerns … or other general problems within the workplace."); *Hall v. City of Chicago*, 152 F. Supp.2d 962, 969–70 (N.D. Ill. 2001) *aff'd*, 52 F. Appx. 259 (7th Cir. 2002) (granting summary judgment for defendant on plaintiffs' retaliation claim based on reports of safety violations: "Title VII was not intended to protect workers from hazardous conditions in the workplace."). Summary judgment should be granted to Carrier on Harris's retaliation claim for this reason alone.

---

[5] The analysis for retaliation claims under the ADA and the ADEA is the same. *Hofmann v. Aspen Dental Mgm't, Inc.*, 2011 WL 3902773, at *2 (S.D. Ind. Sept. 6, 2011) ("the elements of a prima facie case of retaliation under Title VII are the same as under the ADA or the ADEA.").

## B. There Is No Causal Connection Between Harris's Safety Report And Any Materially Adverse Action.

In addition to this claim failing on its face as set forth above, there is no causal connection between Harris's report of alleged safety violations and the alleged adverse employment actions she claims to have experienced. Harris testified that Carrier retaliated against her by denying her several opportunities to work overtime and by reprimanding her in January 2013 for a Plant Rule 15 violation. (SOF 33(b) and (d).) But, as discussed above, Harris admitted that her requests to work overtime were denied based upon a company rule because of her Apprentice classification (*see* supra, at 19), and that she was reprimanded in January 2013 because Martin had instructed her not to touch any wires during a work project, but Harris did so anyway – an admitted violation that led to the reprimand. (*See* supra, at 18.) Thus, it is undisputed that Carrier took these actions for legitimate, non-retaliatory reasons that had nothing to do with her report of alleged safety violations. Summary judgment should be granted on Harris's retaliation claim for this reason as well.

## C. Harris's Eleventh-Hour Retaliation Is Barred And, In Any Event, Fails As A Matter Of Law.

Harris cannot sidestep the two independent bases for summary judgment on her retaliation claim above by offering a new basis for her retaliation claims for the first time in her Statement of Claims. (Dkt. 73.) While Harris now claims that "after [she] filed the first charge, Carrier retaliated by denying Harris's worker's compensation claim for her original injury, and by denying her a reasonable accommodation for her disabilities," (Dkt. 73 at 4), these unsworn allegations entirely contradict her sworn deposition testimony. Harris testified that she believed her safety report was what motivated Carrier's allegedly retaliatory conduct, which Harris also confirmed in her deposition to be the January 2013 reprimand and the denial of overtime. (SOF 33(b), 34.) As such, her "reinvented" retaliation claim should be barred. *Adusumilli v. City of*

25

*Chicago*, 164 F.3d 353, 359-60 (7th Cir. 1998) (A party cannot withstand summary judgment by relying on "conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony.").

Regardless, the undisputed evidence establishes that her new allegations also fail as a matter of law. Harris's workers' compensation claim was denied <u>two years</u> after she filed her July 2013 Charge. (SOF 24, 37.) This time gap cannot support an inference of retaliation. *See, e.g., Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687-88 (7th Cir. 2010) (ten-month span between protected activity and adverse employment action was "far too long" to withstand summary judgment); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734-35 (7th Cir. 2008) (seven-week interval between plaintiff's complaint and adverse action was not evidence of retaliation).

Moreover, a Title VII retaliation claim requires "an adverse action taken *by the employer*." *Tomanovich*, 457 F.3d at 663 (emphasis added). Here, it is undisputed that it was AIG, a third party (not Carrier) that denied Harris's workers' compensation claim. (SOF 24.) AIG's conduct cannot give rise to a retaliation claim against Carrier. *See, e.g., Yanke v. Mueller Die Cut Solutions, Inc.*, 2007 WL 437694, at *9 (W.D.N.C. Feb. 5, 2007) (granting summary judgment to employer where it is undisputed that insurer, not employer, denied worker's compensation claim).

Harris's claim that Carrier denied her a reasonable accommodation is even further temporally removed from her July 2013 Charge — a gap of two and one-half years. (SOF 35, 37.) As such, the two cannot be causally connected as a matter of law. *Filipovic*, 176 F.3d at 399. Furthermore, as set forth in detail *infra*, at all times Carrier accommodated Harris's shoulder injury and went to great lengths to engage in an interactive process to accommodate her

injuries and try to find her replacement positions and work within the company. *See* Section

IV.B.2.

## IV.    CARRIER IS ENTITLED TO SUMMARY JUDGMENT ON HARRIS'S MOVING TARGET ADA CLAIMS.

On March 27, 2017, this Court held that Harris's sole ADA claim relates to an alleged

improper medical inquiry claim. (Dkt. 74 at 5-6.) Furthermore, the Order provided much

needed clarity to pin down Harris's ADA claim, which had been a moving target:

- The December 11, 2015 original Complaint asserts that Carrier discriminated against her in violation of the ADA when it conducted "prohibited medical inquiries." (Dkt. 1 at 4.)

- The October 6, 2016 Amended Complaint claims that Carrier: (1) failed to accommodate her shoulder injury, and (2) discriminated against her based on her alleged disability and/or regarded her as disabled by issuing her "unwarranted discipline" and subjected her to less favorable terms and conditions of employment. (SOF 35.)

- On March 8, 2017, Harris testified in her deposition that her ADA claim is only for failure to accommodate. (SOF 35.)

- On March 17, 2017 in her Statement of Claims, Harris states her claim is that at some unspecified time, Carrier "routinely assigned" tasks to Harris that violated her "work restrictions," which caused her to reinjure her arm in July 2015. (Dkt. 73 at 3.)

That said, no matter which characterization of Harris's ADA claim applies, Carrier is entitled to

summary judgment.

### A.    Harris Has Abandoned Her Sole ADA Claim - Medical Inquiry.

When opposing Carrier's Motion to Dismiss Harris' Amended Complaint, Harris

unequivocally told the Court that her ADA claim "is <u>not</u> a reasonable accommodation claim,"

but rather concerns "'prohibited medical inquiries….'" (Dkt. No. 63, at 6, 8) (emphasis added).)

The Court relied on Harris's representations to deny Carrier's motion to dismiss, holding, "Ms.

Harris clarifies that she is <u>not</u> making a reasonable accommodation claim, but instead that her

claim is based on Carrier <u>conducting prohibited medical inquiries</u> into her medical condition in violation of the ADA." (Dkt. No. 74 at 5 (emphasis added, internal citations omitted).)

However, Harris's subsequently-filed Statement of Claims never mentions her medical inquiry claim. Had Harris intended to proceed on this theory, she was required to include it in her statement. (Dkt. No. 48.) Since she did not and the Court has held it was Harris's sole ADA claim, summary judgment should be granted to Carrier. *Tucker,* 2016 WL 2643737, at *8-9 (S.D. Ind. May 10, 2016) (granting summary judgment in favor of defendant on plaintiff's harassment claim, in part, because plaintiff abandoned the claim in his Statement of Claims); *Deputy*, 2014 WL 4907911, at *5 (S.D. Ind. Sept. 30, 2014) ("[r]equiring the plaintiff to assess the validity of its claims and list what it intends to pursue after non-expert discovery closes protects both parties … [including that] it ensures that a defendant is aware of all outstanding claims when it moves for summary judgment…").

**B.      Had Harris Asserted A Failure-To-Accommodate Claim, That Claim Fails.**

Even if the Court allows Harris's bait-and-switch concerning her ADA claim, a failure to accommodate claim fails as a matter of law for multiple reasons.

*1.      Harris Failed To Exhaust Her Administrative Remedies.*

A failure-to-accommodate claim must be administratively exhausted before it can be pursued in court. *Whitaker v. Milwaukee Cty., Wisconsin,* 772 F.3d 802, 813 (7th Cir. 2014) (affirming summary judgment to employer where plaintiff failed to administratively exhaust her failure-to-accommodate claim). Here, Harris's failure to accommodate claim was not included in her EEOC charges. (SOF 35, 37-38.)

Indeed, by Harris's own admission, she could not have raised this claim in her Charges. Harris asserts that "when [she] returned to work in January 2016, Carrier refused to provide her with either a job within her work restrictions or a reasonable accommodation for her disability,"

39154335v.1

and that "[a]fter a period of seven months, [she] was finally allowed to return to work as an

Inspector." (Dkt. No. 49, at ¶¶ 20-21.) Harris filed her Charges on July 24, 2013 and December

3, 2015, both of which pre-date the alleged conduct. (SOF 37-38.) As a result, there can be no

question that her failure to accommodate claim is barred. *Conner v. Ill. Dept. of Natural Res.*,

413 F.3d 675, 680 (7th Cir. 2005) (affirming claim was outside scope of charge where the

alleged conduct did not occur until one month after plaintiff filed her charge). And as more than

300 days have since elapsed since the alleged conduct, Harris cannot rectify this fatal error.

2. *A Failure-To-Accommodate Claim Fails As A Matter Of Law.*

Setting aside Harris's failure to exhaust her administrative remedies, the undisputed

evidence cannot support a failure-to-accommodate claim. To establish a failure to accommodate

claim, Harris must prove that: 1) she is disabled, 2) Carrier was aware of her disability, and 3)

she is a qualified individual, who, with or without reasonable accommodation, could perform the

essential functions of her job. *Basith*, 241 F.3d at 927. She cannot establish that she is a

qualified individual under the ADA, and even so, Carrier has accommodated her at all times.

Harris is not a qualified individual with a disability because Harris concedes that she was

unable to perform all of the essential functions of her Journey Worker position at the time she

sought to return to work. (SOF 25-27.) This is fatal to her failure-to-accommodate claim.

*Peters v. City of Mauston*, 311 F.3d 835, 84-46 (7th Cir. 2002) (affirming summary judgment to

employer where plaintiff admitted he was unable to perform essential functions of his job);

*Weiler v. Household Fin. Corp.*, 101 F.3d 519, 525 (7th Cir. 1996) (same).

Even so, Carrier did accommodate Harris by first granting her a leave of absence, and

then subsequently reassigning her to an open position within her restrictions. (SOF 22, 31.)

Harris was placed on leave in July 2015. (SOF 22.) When her doctor cleared her to return to

work in September 2015, she was restricted from any overhead lifting or repetitive use of her

dominant left arm and she could not lift over 5 pounds or pull more than 20 pounds with her dominant arm.  (SOF 25.)  Carrier could not accommodate these restrictions.  (SOF 27.)  As such, Harris remained on leave.  In March 2016, Harris contacted Carrier to ask if she could instead be reassigned.  (SOF 29.)  Carrier immediately began to work with Harris, her doctor, and her union to see if reassignment was possible.  (SOF 29.)

After several delays attributable to Harris and after some open positions were rejected by Harris, on August 24, 2016 Carrier, Harris, and her union reached a consensus to reassign Harris to an open Precision Inspector position within her restrictions.  (SOF 30-31.)  Harris performed this role for one month until she felt the position was "very stressful on [her] left hand."  (SOF 31.)  At that point, having exhausted all other options, Carrier again granted Harris a medical leave, where she remains today.  (SOF 31.)   These undisputed facts establish that Carrier did all that it could to accommodate Harris, entitling Carrier to summary judgment.  *Basith*, 241 F.3d at 931-32 (7th Cir. 2001) (affirming summary judgment to employer on a failure-to-accommodate claim where plaintiff could not perform all of the essential functions of his job, employer accommodated his disability by placing him on a medical leave of absence, and, later, by reassigning him.)

 That Harris believes Carrier should have reassigned her to the Ergonomics Technician position is immaterial.  (SOF 35.)  Harris is not entitled to the accommodation of her choice, only to a reasonable accommodation. *Swanson v. Village of Flossmoor*, 794 F.3d 820, 827 (7th Cir. 2015); *Mobley v. Allstate Ins. Co.*, 2006 WL 2735906, at *7 (S.D. Ind. Sept. 22, 2006).  Moreover, Carrier eliminated the Ergonomics Technician position in 2008.  (SOF 36.)

Further, that position has not existed at Carrier since 2008.  (SOF 36.)  The ADA does not require that Carrier re-create that position in 2015 or 2016 as an accommodation. *Stern v. St.*

*Anthony's Health Ctr.*, 788 F.3d 276, 291 (7th Cir. 2015) (affirming summary judgment, noting that employers do not have obligation to create new positions as accommodations); *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000) (same).

   **C.      Harris's Purported New Disability Discrimination Claim Is Barred.**

   As with Harris's retaliation claim, her effort to raise a new disability discrimination theory in her Statement of Claims is a non-starter.  Harris now claims that Carrier allegedly discriminated against her by "routinely assign[ing]" tasks to her that violated her work restrictions.  (Dkt. 73 at 3.)   When asked during her deposition to define her ADA claim Harris testified that her claim was only one for a failure-to-accommodate.  (SOF 35.)   Harris's Statement of Claims cannot contradict her own testimony.  *Adusmilli*, 164 F.3d at 359-60 (holding that party cannot prevail on summary judgment by relying on "conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony.").

   Nor can Harris be allowed to make representations to the Court concerning her claims, and change them when it suits her.  As discussed *supra* Section IV.A, the Court accepted Harris's representation that the only ADA claim she was pursuing concerns Carrier's supposed improper medical inquiries.  (Dkt. 63 at 6; 74 at 5.)  She cannot stave off summary judgment merely by recasting her claim in her Statement of Claims.

**CONCLUSION**

   For the above reasons, Carrier respectfully requests that the Court grant its motion for summary judgment and dismiss Plaintiff's Amended Complaint in its entirety.

39154335v.1

DATED:  May 24, 2017                    Respectfully submitted,

                                        CARRIER CORPORATION


                                        By:    s/ Jill C. Taylor
                                               One of Its Attorneys

Cintra B. McArdle (#25582-64)
Jill C. Taylor
SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, Illinois  60606
Telephone:      (312) 460-5000
Facsimile:      (312) 460-7000
Email:          cmcardle@seyfarth.com
                jctaylor@seyfarth.com

39154335v.1

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2017 a copy of the foregoing DEFENDANT'S BRIEF IN

SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT was filed electronically with the Clerk of the

Court using the CM/ECF system, which will automatically send electronic notification of such

filing to the following attorney of record:

> Jay Meisenhelder
> Jay Meisenhelder Employment & Civil Rights Legal Services, P.C.
> 650 North Girls School Road, Suite B20
> Indianapolis, IN 46214
> jaym@ecrls.com


s/ Jill C. Taylor
Jill C. Taylor